In re MESIBOVSKY.

Appeal of HESSBERG.

(Circuit Court of Appeals, Second Circuit. November 11, 1912.)

No. 65.

USURY (§ 53*)—COLLATERAL—COMPENSATION FOR COLLECTION.

Claimant loaned money to a bankrupt, taking as security assignments of various accounts due to the bankrupt from the latter's customers; claimant agreeing to send out the invoices to the customers and to assume the entire burden of collecting the accounts. The money was loaned at the legal rate of 6 per cent. per annum, but it was also agreed that the bankrupt should pay in addition 2 per cent. on the amount due from the customers for collection. *Held,* that the services rendered by the claimant in collecting the collaterals were not a mere incident to the taking of the collateral security, and that the provision that the claimant should receive 2 per cent. therefor did not render the loan usurious.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 91, 114–118; Dec. Dig. § 53.*]

This cause comes here upon an appeal taken by Felix Hessberg from an order of the District Court for the Southern District of New York, which adjudged that certain loans made by him to Joseph Mesibovsky, the bankrupt, were usurious. The same order adjudged that Hessberg was a private banker, and that, therefore, under the statutes of New York, the usury worked only a forfeiture of the interest; his claim against the bankrupt's estate being held valid to the extent of the principal amount loaned. From this decision the trustee has taken a cross-appeal. We need consider only the appeal of Hessberg.

Cohen, Creevey & Richter, of New York City (Julius Henry Cohen and Theodore B. Richter, both of New York City, of counsel), for appellant.

Eugene L. Bondy, of New York City, for trustee.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts as above). Hessberg from time to time loaned money to the bankrupt, taking as security therefor assignments of various accounts due to the bankrupt from the latter's customers. By agreement between lender and borrower the former was himself to send the invoices to the customers, and was to take practically the entire burden of collecting the accounts which were assigned to him. A more specific statement of what he undertook to do will be found infra in this opinion. For the money loaned the borrower was to pay the legal rate of interest 6 per cent. per annum on the amount loaned, and for the lender's services in connection with collections from the customers he was to be paid in addition 2 per cent. on the amount due from the customer. The referee and the District Judge held that what the lender undertook to do was "quite within his duty as bailee" and that the agreement was merely a cloak for usury.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In the Matter of Canfield, 193 Fed. 934, 113 C. C. A. 562, we found that the lender agreed to render some substantial services, not usually rendered gratuitously by a lender, and that he did in fact render them; that the examination of the books and accounts which he undertook to make would take 5 or 6 days a month; that, although the lender actually did very little work, that was solely because the failure came before the time of the first monthly "complete examination of books, accounts, and vouchers." Had the business run along for a year, the lender "would have made examination of the books and assisted in making collections, which would have taken a considerable part of his time, and been worth a substantial compensation." We, therefore, found that the agreement for and the actual rendering of these services in consideration for a sum additional to the 6 per cent. interest on the loan was not a cloak or device, and that the contract was not usurious.

Subsequently we had before us the case of In re Fishel, 198 Fed. 464, June 5, 1912. A written agreement provided for the rendering of services by the lender in connection with collecting accounts, sending out statements, correspondence with customers, adjusting returns and discounts, extending credits, securing references, etc. This formal agreement was neutralized by a letter from borrower to lender, which stated that it was agreed that the latter was not to make collections, and, indeed, was "at no time to have any communication whatever with any of our customers." In view of this letter, and other testimony in the case, we reached the conclusion that "the lender was not intended to perform any of the service mentioned in section 6 of the agreement." The lender in the Fishel Case did not in fact render these services. In view of these circumstances, we reached the conclusion that the written agreement in that case was a mere cloak or device to hide what was undoubtedly a usurious transaction.

In the case at bar the services rendered by the lender were much the same as those referred to in the written agreement in the Fishel Case, and which were subsequently dispensed with. They were quite as substantial as those in the Canfield Case, and were such as would ordinarily not be performed by a lender of money on collaterals of this sort. Such a lender is under no obligation to undertake the collection of the borrower's bills receivable. In this case, however, the testimony shows that not only were the business ratings of the borrower's customers investigated, and notices of assignment of invoices sent to them, but the lender assumed the entire burden of making the collections, a service which required the employment of clerks, the keeping of books, and a general supervision of the borrower's business, so far as the assigned accounts were concerned. If this work had not been done by the lender, it would necessarily have been done by the borrower, and would have cost money. The testimony of Hessberg's discount clerk and bookkeeper, who kept track of all these transactions, shows in great detail just what this work was: The sending of letter after letter, asking for payment in more and more imperative language, sight drafts against the amounts of unpaid invoices, the selection of a lawyer, and the turning over of each unpaid claim to him with instructions to collect. All these performances were primarily for the borrower to at-

tend to. A lender was under no obligation gratuitously to perform them; and if the lender in this case undertook to do all this work, and did it, and assumed responsibility for doing it carefully and thoroughly, we do not see why he might not properly ask and receive compensation therefor. This case is not distinguishable from the Canfield Case, and we are unable to concur in the opinion of the referee that the arrangement between the parties was "merely a cloak for usury."

The order is reversed.